UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

JEFFREY BRIANT SIMMON,                    Civ. No. 13-3136 (DWF/JSM)

        Plaintiff,                    REPORT AND RECOMMENDATION

v.

CAROLYN COLVIN,

        Defendant.


This matter is before the Court on cross-motions for summary judgment. [Docket Nos. 13 and 15]. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that Plaintiff's Motion for Summary Judgment [Docket No. 13] be **DENIED** and that Defendant's Motion for Summary Judgment [Docket No. 15] be **GRANTED**.

## I.    PROCEDURAL BACKGROUND

Plaintiff Jeffrey Briant Simmon protectively applied for Disability Insurance Benefits and Supplemental Security Income on December 20, 2010. (Tr. 212-223). Simmon alleged an onset date of November 15, 2010, based on his history of a heart condition, high blood pressure, heart attacks and a pacemaker. (Tr. 262). The Social Security Administration ("SSA") denied Simmon's application initially on February 23, 2011, and on reconsideration on April 18, 2011. (Tr. 143-145, 159-160). Simmon requested a hearing pursuant to 20 C.F.R. 404.929 et. seq. and 416.1429 et. seq. (Tr. 166-167). A hearing was held by video teleconference on August 15, 2012, before

Administrative Law Judge Neil Sullivan.  (Tr. 60-97).  Simmon was represented by counsel.  Cheryl Zilka, a vocational expert ("VE") testified at hearing, as did Simmon.

On September 14, 2012, the ALJ issued his decision denying Simmon's concurrent applications.  (Tr. 19-29).  Simmon sought a review of the ALJ's decision by the SSA's Appeals Council.  (Tr. 11-13).  The Appeals Council denied Simmon's request for review, making the ALJ's decision final.  (Tr. 1-4).  See 20 C.F.R. §§ 404.981, 416.1481 42 U.S.C. § 405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. §§ 404.981, 416.1481.  In connection with his Request for Review, Simmon submitted medical evidence not considered by the ALJ and dating from October, 2012.  (Tr. 2, 748-762).  The Appeals Council rejected this evidence as beyond the scope of the ALJ's decision as to whether Simmon was disabled on or before September 14, 2012.  (Tr. 2).[1]  Simmon sought review of the ALJ's decision by filing a Complaint pursuant to 42 U.S.C. § 405. [Docket No. 1].  The parties cross-moved for summary judgment.  [Docket Nos. 13 and 15].

## II.   PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  The SSA shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment."   42 U.S.C. § 1382c(a)(3)(A).   The

---

[1]     The Appeals Council stated that it was rejecting records from the Allina Medical Clinic dated June 11, 2013 through June 12, 2013 and from Central Minnesota Mental Health Center dated August 2, 2013.  (Tr. 2).  This appears to be an error.  The Appeals Council's exhibit list shows records from the Minneapolis Heart Institute dated October 15, 2012 through October 19, 2012.  (Tr. 5).  These records appears again at Tr. 749-762 attached to a cover letter to the Appeals Council from Simmon's attorney.  (Tr. 748).

claimant's impairments must be "of such severity that (the claimant) is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 1382c(a)(3)(B).   The impairment must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.   20 C.F.R. §§ 404.907-09, 416.1407-09.   A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ.   42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429.   To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher v. Sullivan, 968 F.2d 727 (8th Cir. 1992).   The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.     The credibility findings made by the ALJ.

2.     The plaintiff's vocational factors.

3.     The medical evidence from treating and consulting physicians.

4.     The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.     Any corroboration by third parties of plaintiff's impairments.

6.     The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

This Court's review is limited to determining whether the ALJ's decision is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse

and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."

Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III.    DECISION UNDER REVIEW

The ALJ concluded that Simmon was not disabled within the meaning of the SSA's regulations from November 15, 2010 to September 14, 2012 – the date of the ALJ's decision. (Tr. 29). In support, the ALJ made the following determinations under the five-step process. At Step One, the ALJ determined that Simmon had not engaged in substantial gainful activity since November 15, 2010, the alleged onset date, although the ALJ noted that Simmon had collected unemployment benefits until March, 2011. (Tr. 21). At Step Two, the ALJ found Simmon had the following severe impairments: ischemic heart disease, hypertension, hyperlipidemia and dysfunction of a major joint (shoulder). (Id.). At Step Three, the ALJ found that Simmon's impairments or combination of impairments did not meet or equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. In particular, the ALJ concluded that the

6

medical evidence regarding Simmon's shoulder pain did not meet Listing 1.02 for major dysfunction of a joint.  (Tr. 22).  In making this determination, the ALJ also considered Listing 4.04 – Ischemic Heart Disease.  (Id.).  The ALJ found that the record contained no medical findings that Simmon met the criteria of this Listing.  (Id.).

Before considering Step Four of the analysis, the ALJ determined Simmon's residual functional capacity ("RFC"): he could perform light work with the additional restrictions that he could never climb ladders, ropes or scaffolds and could only occasionally climb ramps or stairs.  (Id.).  In addition, Simmon could frequently stoop, kneel, or crouch and could only occasionally crawl or balance.  (Id.).  The ALJ found Simmon limited to occasional overhead reaching with the left upper extremity, and could frequently use gross manipulation and fine-finger manipulation of objects with the upper left extremity.  (Id.).  Finally, the ALJ found Simmon should avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.  (Id.).

In developing this RFC, the ALJ considered Simmon's medical records and the opinions of State Agency physicians Dr. Gregory Salmi and Dr. Dan Larson.  (Tr. 25).  The ALJ noted that Dr. Salmi opined that Simmon could occasionally lift and carry up to 20 pounds and frequently lift and carry up to ten pounds (Id., citing Tr. 103).  Dr. Salmi further opined that Simmon could stand or walk about six hours in an 8-hour day and sit about 6 hours in an 8-hour day.  (Id.).  However, Simmon was limited to no overhead reaching on the left due to shoulder pain and pacemaker placement.  (Id., citing Tr. 104).  Postural limitations included frequent stooping, kneeling and crouching and occasional balancing, crawling and climbing ramps, stairs, ladders, ropes and scaffolds.

7

(Id., citing Tr. 103-104).  On reconsideration, Dr. Larson affirmed Dr. Salmi's conclusions.  (Id., citing Tr. 125-126).  However, Dr. Larson opined that Simmon could do occasional overhead reaching on the left due to improved range of motion and pain control after rehabilitation.  (Id., citing Tr. 126).  The ALJ gave great weight to these opinions because they were consistent with the record.  (Id.).  In addition, the ALJ considered medical evidence submitted after the State Agency consultants rendered their opinions and added additional restrictions based on the new evidence of record.  (Id.).  The ALJ noted the absence in the record of any statements by Simmon's treating physicians that Simmon was unable to work due to his medical conditions.  (Tr. 24).  The ALJ stated that an RFC limited to light work with postural and manipulative restrictions was appropriate given Simmon's status post-pacemaker implantation with high blood pressure and high cholesterol as well as limitations related to his shoulder surgery, limited range of motion, and reported tingling and cramping in his hand.  (Tr. 27).

The ALJ based his decision regarding Simmon's RFC on the following evidence in the record.  Simmon was admitted to the hospital in July, 2009 for shortness of breath and underwent suture repair of a post-infarction ventricular septal defect ("VSD") by a left ventriculotomy with placement of an intra-aortic balloon pump.  (Tr. 23 citing Tr. 319).  Simmon returned to his work of heavy welding.  (Id., citing Tr. 509).  In November, 2010, Simmon had a biventricular pacemaker inserted.  (Id., citing Tr. 420, 487).

In January, 2011, Simmon reported he was doing well and denied any cardiovascular complaints, his physical examination was normal, and he was

encouraged to exercise because of low good cholesterol.  (Id., citing Tr. 532).  Also in January, 2011, Simmon presented to specialist Dr. David Labadie with complaints of increasing pain with motion of his left arm and stiffness.  (Id., citing Tr. 540).  Dr. Labadie diagnosed Simmon with adhesive capsulitis or frozen shoulder and indicated that this condition may have been aggravated by the pacemaker surgery.  (Id., citing Tr. 540).  Dr. Labadie recommended corticosteroid injections and physical therapy.  (Id., citing Tr. 540).  Simmon had the injections and attended ten physical therapy sessions, after which he reported improved pain and range of motion.  (Id., citing Tr. 540, 551).

Simmon continued to seek care for his blood pressure and pacemaker functioning.  (Tr. 23).  At an office visit with his primary care physician, Dr. Robert Mullaney in December, 2010, Simmon's blood pressure was high, but he was asymptomatic.  (Tr. 23, citing Tr. 502).  Simmon told Dr. Mullaney that his heart hurt at times, but he attributed this to his pacemaker and did not report any other symptoms. (Id., citing Tr. 502).  The ALJ noted that in March, 2011, Simmon had pain near his pacemaker site and Dr. Mullaney suspected that it was positional or from irritation at the surgical site.  (Tr. 23 citing Tr. 546).  Dr. Mullaney reported that Simmon had excellent exercise tolerance, no respiratory symptoms and his blood pressure was at goal.  (Id., citing Tr. 546).

Simmon had arthroscopic shoulder surgery in June, 2011, to repair torn tendons to his left shoulder.  (Tr. 24, citing Tr. 592, 601).  After the surgery, Simmon experienced a hypertensive crisis, for which he was hospitalized.  (Tr. 24, citing Tr. 591).  Simmon was monitored for a day and released.  (Id., citing Tr. 592).  Dr. Mullaney noted that Simmon's blood pressure continued to fluctuate and prescribed medication.  (Tr. 23,

citing Tr. 721).  By July, 2011, Simmon's blood pressure was lower and he reported that he was doing well and did not have any chest discomfort or dyspnea related to exertion. (Id., citing Tr. 574).  Simmon's pacemaker was functioning normally.  (Id., citing Tr. 574, 575).

After his arthroscopic surgery, Simmon had physical therapy for several months, but continued to have pain. (Tr. 24, citing Tr. 621-695).  As a result, Simmon sought a second opinion from Dr. William Lundberg.  (Id., citing Tr. 563).  Simmon underwent additional diagnostic testing, which showed a full-thickness tear through his distal rotator cuff.  (Id., citing Tr. 563).  This tear was described as "fairly high-grade involving the middle one-third fibers distally."  (Id., citing Tr. 566).  Dr. Lundberg recommended more aggressive physical therapy, but not surgery.  (Id., citing Tr. 582).  Dr. Lundberg also indicated that Simmon was fine to return to work and placed him on a ten pound weight restriction for his left shoulder.  (Id., citing Tr. 582).

In March, 2012, Simmon saw Dr. Mullaney and complained of blurry vision, lightheadedness, and some vertigo.  (Id., citing Tr. 742).  Simmon's blood pressure was high and Dr. Mullaney suspected a transient ischemic attack or a small cerebral vascular accident, but Simmon declined to be hospitalized.  (Id., citing Tr. 745). Simmon did, however, go to an emergency room where his blood pressure was mildly elevated, but then spontaneously diminished.  (Tr. 24, citing Tr. 614).  A CT scan of Simmon's head showed no acute changes, and Simmon declined any further work-up. (Id., citing Tr. 614).  Simmon followed up with Dr. Mullaney, who noted that Simmon's blood pressure was normal and his symptoms were resolving. (Id., citing Tr. 745).

In considering the medical evidence, the ALJ noted that there were no medical source statements or opinions regarding any specific limitations Simmon might have. (Tr. 24). The ALJ considered Dr. Mullaney's treatment notes, which indicated in November, 2010, that Simmon could not return to work as a heavy welder because of his heart disease and pacemaker. (Id., citing Tr. 501). However, the ALJ noted that Dr. Mullaney did not opine as to Simmon's ability to do other work, and in April, 2011, Dr. Mullaney had stated that he was not an expert on disability and could not opine on Simmon's ability to work. (Tr. 25, citing Tr. 700).

ALJ concluded that overall, Simmon's statements regarding the severity of his impairments were only partially credible because his treatment records did not support the severity of the disabilities he was claiming. (Tr. 25, 27). In support, the ALJ found that Simmon had no difficulty in caring for himself and Simmon was able to cook, do laundry and housework and shop. (Tr. 25, citing Tr. 270-271). Simmon testified that he could stand for ten minutes before becoming fatigued, could walk for 30 minutes if he was not in extreme temperatures and could lift ten pounds at the most because of his shoulder pain. (Tr. 25). Further, Simmon's cardiologist and Dr. Mullaney stated that Simmon was doing well; Dr. Mullaney reported that Simmon had excellent exercise tolerance; and in March, 2011, Simmon reported that he was walking quite a bit with no pain or shortness of breath. (Tr. 26, citing Tr. 531, 554, 574). The ALJ found that this evidence did not support Simmon's allegation that he could only walk thirty minutes at a time. (Id.). The ALJ also noted that Simmon had bought a gym membership. (Id.).

The ALJ found no evidence to support Simmon's claim that extended use of his hand caused cramping. (Id.). The ALJ noted that in January, 2011, Simmon denied

any numbness or tingling in his left arm and denied any neck pain or radiating pain. (Id., citing Tr. 540).  The ALJ acknowledged that in July, 2011, Simmon reported that he had some tingling in his finger due to his shoulder surgery, but also noted that physical exam showed that Simmon could feel light touch to all five digits and his grip strength was okay.  (Id., citing Tr. 605, 606).  The ALJ further noted that Simmon's medications were limited to aspirin for his heart and medications for high blood pressure and high cholesterol, but Simmon was not taking any medication for his shoulder pain "as one would expect if the claimant were in severe and limiting pain."  (Id.).

The ALJ also noted that Simmon's physicians did not opine as to his work-related limitations.  (Id.).  On the other hand, the State Agency medical consultants gave credible evaluations of the evidence and their reviews of the evidence supported a conclusion that Simmon was able to work at the light exertional level with some additional restrictions.  (Id., citing Tr. 98-107, 119-129).

Lastly, the ALJ concluded: "[o]verall, the claimant's statements regarding the severity of his impairments are only partially credible as evidenced by his treatment record, inconsistencies with treatment, activities, and conservative pain management." (Tr. 27).  The ALJ noted that Simmon reported that he attempted to find work in the retail sector, indicating that he believed that he could work.  (Tr. 26).  Additionally, Simmon reported that he was working on getting into school for retraining.  (Id.). Simmon's complaint that he ached all over and had left leg problems was unsupported by any evidence.  Furthermore, the record showed that Simmon did not always follow through with treatment recommendations regarding his shoulder.  (Id., citing Tr. 624, 631, 638, 649, 652).  Simmon also declined a referral to a specialist regarding his

dizziness and continued to smoke despite having been told repeatedly to stop because of his history of coronary artery disease and myocardial infarction.  (Tr. 27, citing Tr. 614, 576).

At the fourth step of the analysis, the ALJ concluded that Simmon was precluded from performing past work as an arc welder and boilermaker because those jobs were performed at a heavy exertional level that exceeded Simmon's RFC.  (Id.).  The ALJ found, however, that Simmon was able to perform the work of an electrical assembler – work Simmon had performed within the past fifteen years.  (Id.).  The ALJ also noted that although he had determined that Simmon could perform past relevant work, there were other jobs in the national economy that Simmon could also perform.   (Id.).  Consequently, at the fifth step of the analysis, and based upon the VE's testimony, the ALJ found that an individual with Simmon's characteristics and limitations would be able to perform the requirements of representative occupations such as document preparer, cutter, and lens inserter at the sedentary level.  (Tr. 28-29).

## IV.    THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT

### A.    Simmon's Motion for Summary Judgment

Simmon argued that the ALJ erred at Steps Three, Four and Five of the sequential evaluation.  Plaintiff's Memorandum ("Pl. Mem."), pp. 10-19 [Docket No. 14].[2] Simmon first claimed that at Step Three (whether Simmon's impairments or combinations of impairments met or medically equaled a listed impairment), the ALJ "dismissively determined that Simmon did not meet the criteria for Listing 4.04-Ischemic

---

[2]        Simmon also appeared to take issue with the ALJ's finding at Step Four that Simmon could perform his prior work as an electrical assembler, because Simmon had never worked as an electrical assembler.  Pl. Mem., pp. 7-8.  However, Simmon did not specifically challenge Step Four in his arguments.

Heart Disease," (id., p. 6), and then failed to consider the limiting effects of his heart condition and blood pressure issues in combination with his left shoulder repair, which Simmon contended were at least of "equal medical significance" to the criteria in Listing §4.04(C) (Ischemic Heart Disease). Id., pp. 11-15.  According to Simmon, by failing to consult with a medical expert regarding the issue of medical equivalency, the ALJ did not fulfill his duty to fully develop the record. Id., pp. 13-15.

Second, Simmon maintained that Dr. Mullaney's RFC opinion was entitled to controlling weight at Step Four, consistent with 20 C.F.R. §§404.1527(c)(2) ("If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.").  Simmon submitted that the ALJ erroneously substituted his own opinions for those of Dr. Mullaney, contrary to governing law. Id., p. 17 (citing Ness v. Sullivan, 904 F.2d 432, 435 (8th Cir. 1990) ("[T]he ALJ ignored the law of this circuit, which states that the ALJ must not substitute his opinions for those of the physician.")).  Simmon argued that Dr. Mullaney's disability opinion was particularly compelling because he had earlier opined that Simmon was not disabled. Id., p. 16 (citing Tr. 507).

Third, Simmon contended that the ALJ erred at the Step Five of the sequential analysis by asking the VE a hypothetical question that did not comprehensively describe Simmon's limitations consistent with Dr. Mullaney's RFC opinion and by asking about the electrical assembler job, which Simmon claimed he never performed. Id., pp. 17-18.

Simmon sought remand to the Commissioner for further proceedings.   Id., pp. 18-19.

**B.    Commissioner's Motion for Summary Judgment**

The Commissioner argued that the ALJ committed no error in assessing Dr. Mullaney's opinions, noting that Dr. Mullaney merely stated that Simmon could not return to work as a heavy welder because of his heart disease and pacemaker. Defendant's Memorandum in Support of Motion for Summary Judgment ("Def. Mem."), p. 5 [Docket No. 16].  The Commissioner pointed out that Dr. Mullaney never stated that Simmon could not perform any other work, Dr. Mullaney admitted that he was not an expert in disability, and could not render an opinion on Simmon's ability to work.   Id. Further, the ALJ did not conclude that Simmon could return to work as a heavy welder and, therefore, did not err in his assessment of Dr. Mullaney's notes.   Id., p. 6.  The Commissioner also challenged Simmon's characterization of Dr. Mullaney's statement as an "RFC assessment."   Id., p. 5.

The Commissioner rejected Simmon's argument that the ALJ erred by substituting his opinion for the opinions of Dr. Mullaney.   Id.  The Commissioner noted that Dr. Mullaney never submitted an RFC assessment and the ALJ properly relied on the RFC assessments of the State Agency physicians, as well as Simmon's testimony, particularly in the absence of any other opinions.   Id.

The Commissioner also took issue with Simmon's argument that the ALJ erred at Step Four by presenting an inaccurate hypothetical to the VE and relying a position Simmon never held (electrical assembler), to conclude that Simmon could return to past relevant work.   Id., p. 7.  Even assuming that the ALJ erred with regard to the electrical

assembler job, the ALJ made alternate findings at Step Five that Simmon could perform other work existing in significant numbers in the national economy. <u>Id.</u> The Commissioner contended that where Simmon failed to identify any actual limitations unaccounted for by the ALJ in his hypotheticals, the ALJ's reliance on the VE's testimony at Step Five cured any error the ALJ may have committed. <u>Id.</u>

Additionally, the Commissioner rebuffed Simmon's argument that his left shoulder impairment, in conjunction with his ischemic heart disease and high blood pressure, equaled a Listing. <u>Id.</u> The Commissioner noted the ALJ's findings that Simmon was doing well from a cardiovascular standpoint, his pacemaker was functioning well, he had excellent exercise tolerance, he could walk without shortness of breath or pain, and he purchased a gym membership. <u>Id.</u>, p. 8 (citing Tr. 26, 523, 525, 531, 570, 574, 579, 696). According to the Commissioner, Simmon's failure to support his argument that he met or equaled Listing 4.04(C), with specific references to the record, resulted in a waiver of the argument. <u>Id.</u> (citing <u>Johnson v. Commissioner of Soc. Sec.</u>, Civ. No. 11-1268 (JRT/SER), 2012 WL 4328413, at *23 (D. Minn. July 11, 2012) (failure "to provide any argument to support . . . bare assertions . . . results in waiver of the argument.").

Finally, as to Simmon's complaint that the ALJ should have called a medical expert to "fully and fairly develop the record," the Commissioner argued that where Simmon failed to identify any deficiencies in the record that required further development or any significant limitations in his activities of daily living, as required by the Listing 4.04, the ALJ appropriately relied on the medical findings of the State

Agency physicians, who specifically considered whether Simmon's impairments met or equaled a listed impairment, including Listing 4.04.  Id., p. 9.

The Commissioner asked the Court to affirm the denial of benefits to Simmon. Id., p. 10.

## V.   SIMMON'S RELEVANT MEDICAL HISTORY

### A.   Medical Evidence

#### 1.   Heart Disease and Hypertension

Simmon was hospitalized in July, 2009, for the repair of a post-infarction ventricular VSD.  (Tr. 319-335).  Simmon was found to have a ruptured ventricular septum and underwent emergency surgery.  (Tr. 326).  Following his surgery, Simmon had bouts of hypertension and fever.  (Tr. 320).  Simmon was discharged and placed on a 10-pound lift, push-and-pull restriction for six weeks following surgery, then 20 pounds for an additional six weeks, followed by no restrictions.  (Tr. 320-321).  The cardiology admission note indicated that Simmon had worked as a welder until November, 2008, eight months before his cardiac surgery, and that before June, 2009, he had been able to run without any symptoms.  (Tr. 323).  A few weeks after his heart surgery Simmon presented at the emergency room complaining of "flank pain."  (Tr. 411-416).  The treating physician concluded that Simmon was experiencing rib pain secondary to his surgery and discussed with Simmon ways he could relieve this pain, such as lying propped up on pillows and cutting back on activity, as Simmon admitted he had likely been "over doing it."  (Tr. 414).

In January, 2010, Simmon visited his primary care physician, Dr. Mullaney, to discuss disability.  (Tr. 507).  Dr. Mullaney noted on some forms Simmon asked him to

fill out that Simmon "is NOT disabled." (Id.) (capitalization in original).   Simmon

presented with very high blood pressure and told Dr. Mullaney that he was "very

stressed out" and "has issues with lots of financial stress." (Id.)  Simmon attributed his

high blood pressure to his stress. (Id.).  Simmon saw Dr. Mullaney on July 21, 2010 for

an upset stomach and swollen glands and Dr. Mullaney noted that Simmon was doing

heavy welding at that time.  (Tr. 509).

In November, 2010, Simmon presented with a five-month history of fatigue and

shortness of breath, such as when lifting heavy objects.  (Tr. 419, 430).  Simmon was

found to have a high degree atrioventricular block[3] and was hospitalized for further

evaluation.  (Tr. 419-420).  The admitting physician noted Simmon's medical history of

VSD status post repair, hyperlipidemia and coronary artery disease.  (Tr. 420).  Simmon

underwent a pacemaker placement and was discharged several days later with

instructions to follow up with his primary care provider in a week and his cardiologist in a

month.  (Id.).  Simmon was instructed to contact Medtronic, the manufacturer of the

pacemaker, regarding possible sources of electromagnetic interference with the

pacemaker, including welding.  (Tr. 437).

Simmon saw Dr. Mullaney for follow-up on November 23, 2010.  (Tr. 501).  Dr.

Mullaney's noted: "We review [M]edtronic's recommendations as far as welding is

concerned and also cardiology's lifting restrictions.  These are incorporated into his

workability form today . . .[w]ork restrictions are reviewed with pt today.  We also

discuss that he can not do what he used to do in terms of working as a welder and lifting

---

[3]     Atrioventricular block is partial or complete interruption of impulse transmission
from the atria to the ventricles.
http://www.merckmanuals.com/professional/cardiovascular_disorders/arrhythmias_and_
conduction_disorders/atrioventricular_block.html

due to heart disease and limitations due to pacer.  I therefore recommend he consider seeking disability.  This is a 10 minute visit 90% of which is spent counseling on the above issues."  (Id.).

On December 2, 2010, Simmon saw nurse practitioner Denise Carter at the Minneapolis Heart Institute for a follow up after his pacemaker placement.  (Tr. 526-526).  Carter noted that Simmon's job as a welder had recently been terminated because he could not weld following implantation of the pacemaker.  (Tr. 527).  Further, "[Simmon] states that he is going to look at possibly applying for disability and may look into some vocational training."  (Id.).  Carter concluded that Simmon "appears to be stable from a cardiovascular standpoint" and discussed the importance of Simmon's efforts to stop smoking.  (Tr. 529).

Simmon saw Dr. Mullaney on December 23, 2010, and complained of pain in his left shoulder and complained that his heart hurt from symptoms of the pacemaker placement.  (Tr. 502).  Dr. Mullaney referred Simmon to orthopedics for a consultation regarding his shoulder pain.  (Tr. 503).

Dr. Casey Lawler, a cardiologist with the Minneapolis Heart Clinic, saw Simmon on January 4, 2011.  (Tr. 530-533).  Simmon told Dr. Lawler that he was doing well from a cardiovascular standpoint, but that he had lost his job as a welder because of his pacemaker and was receiving unemployment benefits.  (Tr. 531).  Dr. Lawler encouraged Simmon to begin an exercise program either at a local gym or at home.  (Tr. 532).  Simmon saw Dr. Mullaney again on March 17, 2011, and at that time, Dr. Mullaney noted that Simmon had "excellent exercise tolerance, no respiratory symptoms and [blood pressure] at goal as well."  (Tr. 554).  Simmon sought a disability

opinion from Dr. Mullaney on April 14, 2011.  (Tr. 700).  Dr. Mullaney told Simmon stated "I spend time with him today explaining that I am not an expert on disability and therefore unable to render an opinion in regards to his question about his ability to work."  (Id.).

Simmon experienced a hypertensive crisis after shoulder surgery in June, 2011, and was admitted to the hospital for a day.  (Tr. 592-594).  Simmon saw Dr. Mullaney on June 24, 2011, after his surgery because he was worried about his blood pressure.  (Tr. 723).  Simmon told Dr. Mullaney that he was taking his blood pressure at home twice a day and was concerned because sometimes his blood pressure was in the 170s, though sometimes it was in the 140s.  (Tr. 723).  Dr. Mullaney advised Simmon to stop taking his blood pressure at home and instead to have it taken at the clinic once a week.  (Id.).  Dr. Mullaney noted "I think that [Simmon] is making himself anxious about his [blood pressure] by taking his [blood pressure] at home so often."  (Tr. 724).

Dr. Lawler saw Simmon for follow-up on July 27, 2011.  (Tr. 574-577).  Dr. Lawler noted that Simmon was continuing to do well from a cardiovascular standpoint but that "unfortunately" he was continuing to smoke.  (Tr. 576).

Simmon saw Dr. Mullaney on March 20, 2012, complaining of blurry vision, lightheadedness, being off balance, and vertigo when he turned his head to the right.  (Tr. 742).  Dr. Mullaney offered to hospitalize Simmon at the Buffalo, Minnesota hospital, but Simmon declined, although he did indicate that if hospitalization was necessary, he would prefer to be at Abbott Northwestern Hospital in Minneapolis.  (Id.).  Dr. Mullaney recommended diagnostic imaging to rule out a cerebral vascular accident and referred Simmon to the emergency room for evaluation.  (Tr. 743, 744).  A CT scan

of Simmon's head showed no acute changes. (Tr. 614). The emergency room physician offered further work up and a transfer to the neurology department, but Simmon declined. (Id.). At a follow-up appointment two days later with Dr. Mullaney, Simmon's blood pressure was normal and his symptoms were resolving. (Tr. 746).

Simmon submitted additional medical records to the Appeals Council in connection with his request for review. (Tr. 749-762). Simmon saw cardiology resident Dr. Louis Kohl at the Minneapolis Heart Clinic on October 15, 2012. (Tr. 750-755). Simmon complained that one to two months prior he had experienced severe chest pain when helping his father install a dock and since that time experienced similar symptoms when exercising on a treadmill. (Tr. 750). Dr. Kohl checked Simmon's pacemaker and found it to be functioning properly. (Id.). Dr. Kohl recommended an exercise stress echocardiogram and noted that "for the present we will defer any comment regarding patient's fitness to return to work." (Tr. 754). Dr. Lawler signed Dr. Kohl's exam notes and also noted that the exam was "unremarkable." (Tr. 755).

On October 19, 2012, Simmon had a stress echocardiogram. (Tr. 761-762). Simmon could not achieve a maximal heart rate and the cardiologist noted that the images from the exam were "somewhat technically difficult." (Tr. 762). Nonetheless, the images showed overall improvement in left ventricular systolic function with maximal stress and no clear regional wall motion abnormality that developed in other parts of the heart with maximal stress. (Id.). The Appeals Council rejected any consideration of this

evidence, noting that Simmon could file a new application for benefits based on his post-hearing condition.[4]  (Tr. 2).

### 2.   Left Shoulder Surgery and Rehabilitation

Simmon saw Dr. David Labadie for his left shoulder pain on January 7, 2011. (Tr. 539-540).   Dr. Labadie assessed Simmon with adhesive capsulitis or frozen shoulder and administered a corticosteroid injection into Simmon's left shoulder.  (Tr. 540).  Dr. Labadie referred Simmon to physical therapy.  (Id.).  Dr. Labadie saw Simmon again on February 21, 2011.   (Tr. 550-552).   Simmon reported that he did not experience increased pain since starting his physical therapy and home exercise program and Dr. Labadie discharged Simmon from physical therapy as "he has met most of his goals and is independent with his [home exercise program].  (Tr. 551).  Dr. Labadie noted that Simmon had met his functional goals for his left shoulder, such as being able to complete his activities of daily living.  (Id.).  The only goal Simmon did not meet was being able to lie on his left side.  (Id.).  On May 23, 2011, Simmon saw an orthopedist because of left shoulder pain and a feeling of "grinding and snapping" when he lifted his arm.  (Tr. 704).  The orthopedist discussed rotator cuff repair with Simmon, who indicated that he wished to proceed with the surgery.  (Id.).

In June, 2011, Simmon underwent a left shoulder arthroscopy and arthroscopic rotator cuff repair.  (Tr. 601-603).  Following this surgery, Simmon had physical therapy. (Tr. 621-695).  On September 22, 2011, sixteen weeks after surgery, Simmon told his physical therapist that he had less mobility than before his surgery and "that's not right – something's wrong, I may have to get a second opinion."  (Tr. 678).   The physical

---

[4]     Simmon did not allege any error by the Appeals Council in rejecting this evidence.

therapist noted that Simmon was going to talk to his orthopedic surgeon about his lack of progress in physical therapy.  (Tr. 680).  By October 17, 2011, Simmon reported that he felt he had made some gains with his shoulder, but the physical therapist noted that he had not met his functional goals in physical therapy.  (Tr. 691).  At his last physical therapy session on October 31, 2011, Simmon reported that his range of motion was improving and that his pain level was better.  (Tr. 694).  The physical therapist noted that Simmon had not met his goal of full recovery of the use of his left arm.  (Id.).

On November 7, 2011, Simmon saw Dr. William Lundberg at Twin Cities Orthopedics for a second opinion on his left shoulder.  (Tr. 585).  Simmon reported persistent pain since the surgery and thought it was "ridiculous" that he was given a return to work slip.  (Id.).  Simmon's primary complaint was lack of motion.  (Id.).  Dr. Lundberg ordered a CT arthrogram of Simmon's left rotator cuff.  (Id.).

On November, 17, 2011, Simmon had an arthrogram on his left shoulder.  (Tr. 563-564).  The arthrogram showed a partial tear in Simmon's distal rotator cuff.  (Tr. 563).  A CT scan performed after the arthrography showed partial-thickness tearing of the tendons in Simmon's left rotator cuff.  (Tr. 565).  At a follow-up appointment at the end of November, 2011, with Dr. Lundberg, Simmon reported problems with stiffness, but Dr. Lundberg stated "I really feel that this is all a therapy issue.  I think he needs to get much more aggressive with his therapy . . . I think it is fine for him to get back to work.  We will place him on a 10 lb. restriction on his left shoulder.  I think he should continue therapy and I wrote a prescription for this."  (Tr. 582).  Dr. Lundberg did not recommend any additional surgery.  (Id.).

In January, 2012, Simmon returned to Dr. Lundberg, who noted that Simmon was doing much better and that he had been working with a physical therapist. (Tr. 580).  Dr. Lundberg noted that Simmon was "currently working on getting back into school for some more retraining." (Id.).  Dr. Lundberg further stated "We went over his disability forms.  Essentially we will let him get back to work with a 10-lbs. restriction on his left.  We probably would release that to no restriction at about the year time point from his surgery." (Id.).

Simmon completed a course of physical therapy on February 27, 2012. (Tr. 588-590).  The physical therapist completing the discharge summary stated that Simmon reported no pain in his left shoulder and he did not have any pain with self cares, but occasional pain on waking up due to sleep positioning. (Tr. 588).  Simmon reported doing his exercises at home and stated that he could drive his car with both arms, including steering with his left arm while driving in reverse. (Id.).

### B.    State Agency Physicians' Opinions

State Agency physician Dr. Gregory H. Salmi completed a physical RFC assessment regarding Simmon on February 22, 2011. (Tr. 102-107).  Dr. Salmi considered the following Listings:  1.02 (Dysfunction, Major Joints); 4.04 (Ischemic Heart Disease); and 4.05 (Recurrent Arrhythmias). (Tr. 102).  Dr. Salmi found Simmon only partially credible regarding the intensity, persistence, and functionally limiting effects of his symptoms. (Tr. 102).  In reaching this credibility determination, Dr. Salmi considered Simmon's activities of daily living and the objective findings in the medical record. (Id.).  Dr. Salmi noted Simmon's history of hospitalization for post-infarction VSD and pacemaker placement as well as his shoulder pain. (Tr. 101).  Dr. Salmi rated

Simmon's exertional limitations as follows:  Simmon could occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk about 6 hours in an 8 hour work day; sit (with normal breaks) for about 6 hours in an 8-hour work day; and had unlimited ability to push and/or pull.  (Tr. 103).  Dr. Salmi rated Simmon's postural limitations as follows: Simmon could occasionally climb ramps or stairs; occasionally climb ladders, ropes or scaffolds; occasionally balance; frequently stoop, kneel and crouch and occasionally crawl.  (Tr. 104).  Dr. Salmi found that Simmon had limited ability to reach overhead with his left arm (and concluded "no overhead lifting on left due to shoulder pain/pacemaker placement), but had unlimited ability regarding fine and gross manipulation and feeling.  (Id.).  Dr. Salmi considered the November 23, 2010 chart note by Dr. Mullaney in which he stated that Simmon could "not do what he used to do in terms of working as a welder and lifting due to heart disease and limitations due to pacer.  I therefore recommend he consider seeking disability."  (Tr. 501).  Dr. Salmi concluded that this opinion "is without substantial support from other evidence of record, which renders it less persuasive."  (Tr. 105).  Dr. Salmi also concluded that Simmon could not perform his past work as a welder or forklift driver because of the light RFC .  (Id.).  Dr. Salmi opined that Simmon's exertional limitations did not significantly erode the occupational base.  (Tr. 106).  Dr. Salmi concluded that Simmon was not disabled.  (Id.).

On April 14, 2011, State Agency physician Dan Larson completed an RFC on Simmon in connection with Simmon's request for reconsideration.  (Tr. 125-129).  Dr. Larson noted the same exertional, postural and manipulative limitations as Dr. Salmi, and also noted that Simmon demonstrated improved post-operative exercise tolerance

and improved range of motion and pain control post-rehabilitation for his shoulder surgery. (Tr. 126). Dr. Larson also indicated that Simmon denied increased shoulder pain since beginning physical therapy at the Sister Kenny Institute (Tr. 123, citing treatment note dated February 21, 2011). Dr. Larson further observed that Simmon was walking "quite a bit" and denied shortness of breath or pain. (Id. citing treatment note dated March 17, 2011). Dr. Larson found that Simmon could do occasional overhead reaching on the left side due to his improved range of motion. (Tr. 126). Dr. Larson also found that Simmon was precluded from performing past work because of the assigned light RFC. (Tr. 128). Like Dr. Salmi, Dr. Larson concluded that Simmon was not disabled. (Id.).

## VI.   ADULT FUNCTION REPORT

Simmon submitted an Adult Function Report dated December 22, 2010. (Tr. 269-278). Simmon stated that he had a "heart healthy" breakfast, made calls, went to doctor appointments and completed paperwork every day. (Tr. 279). Simmon reported having constant headaches since his pacemaker was implanted; had no problems with personal care; had no need for special reminders to take care of personal needs and grooming, or help remembering to take medicine. (Tr. 271). Simmon stated that he cooked for himself, did his laundry, had help from his family with yard work, shopped two or three times a week, walked, drove a car, and could handle his own finances. (Tr. 272). Simmon reported watching television and reading and stated that he did not spend time with other people and did not go out regularly for social events. (Tr. 273). Simmon checked boxes indicating that his medical condition affected his ability to lift, squat, bend, stand, reach, walk, kneel, climb stairs, complete tasks, concentrate or use

his hands.  (Tr. 274).  Simmon noted that he had a "10 pound weight restriction and very low energy levels."  (Id.).  Simmon stated that he could walk a half block at a time. (Id.).  Simmon further reported that he did not handle stress well and did not handle changes in routine well.  (Tr. 275).  Simmon commented that he had debilitating heart disease that "seems to be getting worse."  (Tr. 276).

## VII.    HEARING TESTIMONY

At the hearing on August 15, 2012, Simmon testified that he was born on November 15, 1962.  (Tr. 64, 65).  At the time of the hearing, Simmon was living in the back of a motel and was receiving general assistance of $200 per month.  (Tr. 65). Simmon was borrowing money from family and friends.  (Id.).  Simmon stated that he completed high school and two years of vocational training in welding.   (Tr. 66). Simmon reported that he had been applying for jobs in "local retail work" but had not had any luck in obtaining an interview or a job offer.  (Tr. 68, 69).  Under questioning by his attorney, Simmon stated that his doctors made it clear that he could no longer weld. (Tr. 70).  As to impediments to performing other types of work, Simmon stated that he experienced exhaustion and had no energy.  (Tr. 70).  Simmon attributed this to his heart problems.  (Id.).  As an example of his exhaustion, Simmon stated that he tried to help his father by carry two-pound planks about 30 feet, but could not because his chest started hurting.  (Tr. 76).  Simmon also testified that his chest pain and exhaustion were such that taking a shower and toweling off was so exhausting that he had to rest before he could finish dressing.  (Tr. 77).  Simmon stated that he could only stand for about ten minutes before he became fatigued, although he also testified that his doctor wanted him to walk 30 minutes a day and that he recently joined a gym and had walked on a

treadmill for 30 minutes one day and 15 minutes another day.  (Tr. 78, 70).  Simmon reported that he could sit without any problems.  (Tr. 80).

Simmon testified that he experienced pain in his left leg from a previous fracture, nerve damage in his hand, and limited range of motion in his left shoulder and arm and weakness in his arm.  (Tr. 73).  Simmon reported that he could not even hold a cell phone without his had cramping up within a minute.  (Tr. 74).  Simmon stated that he could use his left arm to tie shoes and button buttons, but if he did that very often his fingers and hand would swell.  (Tr. 75).  Simmon also stated that if he was using both hands to manipulate objects, such as assembling things, within a few minutes he would have problems with his left hand.  (Id.).  Simmon reported that he grocery shopped, but only picked up a few things at a time because he couldn't carry a lot and could not go back and forth from the car to his room.  (Tr. 80).  Simmon testified that he cooked for himself and washed his own dishes.  (Tr. 81).

As to his daily activities, Simmon testified that on a typical day, he primarily dealt with his medical issues by attending appointments, but otherwise stayed in his room watching television and reading.  (Tr. 83).  Simmon reported attending a Twins baseball game with his brother, but he had difficulty with the stairs.  (Id.).  In addition, Simmon reported having difficulty tolerating heat, humidity and cold.  (Id.).  Simmon also testified that his hypertension gave him frequent headaches.  (Tr. 84).

The ALJ asked Simmon about his job search efforts and Simmon responded that he had not applied for a job within the past six months but had previously applied for retail positions at Target and Wal-Mart.  (Tr. 85).

The VE testified that Simmon had previously worked as an arc welder at the heavy strength level; a boiler maker at the heavy strength level and as an electrical assembler, which is classified as a light strength occupation, but which Simmon performed at a medium strength level.  (Tr. 89).  The ALJ asked the VE to assume a hypothetical individual of Simmon's age, education and work experience, who would be limited to the full range of exertionally light work, but who should never climb ladders, ropes or scaffolds, could frequently stoop, kneel or crouch, and could occasionally climb ramps or stairs and could occasionally crouch or balance.  The individual would be limited to occasional overhead reaching with the left upper extremity and would be limited to frequent gross manipulation and fine finger manipulation with the left upper extremity.  This individual should also avoid concentrated exposure to the use of hazardous machinery, operational control of moving machinery, and unprotected heights.  (Tr. 90).  The VE testified that an individual in those circumstances could not perform any of Simmon's past work with the exception of electrical assembler, as it is listed in the Dictionary of Occupational Titles.  The ALJ went on to ask whether there were other jobs in the local or national economies this hypothetical individual could perform.  (Tr. 90-91).  The VE responded that the individual could work as a bench assembler, a linen supply load builder and a ticket printer/tagger – all of which could be performed at the light exertional level.  (Tr. 91).

The ALJ then changed the hypothetical, asking the VE to assume an individual who was limited to the full range of exertionally sedentary activity, with the other limitations noted previously.  (Tr. 91-92).  The VE testified that this individual could not perform any of Simmon's past work, but could perform the following jobs, all of which

were classified as sedentary: document preparer, cutter/paster, and lens inserter.  (Tr. 92).  The ALJ next asked the VE to consider the employability of a person in the same circumstances as the first two hypotheticals, but who would be "off task"[5] as much as 20% of a work day, in addition to regularly scheduled breaks.  (Id.).  The VE responded that in her opinion such an individual would be unemployable.  (Id.).

Simmon's attorney also questioned the VE.  (Tr. 93-95).  Simmon's attorney asked the VE if the electrical assembler job would be eliminated if a person with Simmon's medical history could not be around electromagnetic fields.[6]  (Tr. 93).  The VE replied that there was a "strong possibility" that would be true.  (Id.).  Simmon's attorney then asked the VE whether someone who could only use one of their hands for 15 minutes at a time for a total of 30 minutes out of an hour would be limited to "occasional" rather than "frequent" use of the hand, and the VE responded affirmatively. (Id.).  The VE further stated that if the person could only "occasionally" engage in finger manipulation, light and sedentary work would be precluded.  (Tr. 95).

## VIII.  DISCUSSION

### A.    The ALJ's Duty to Develop the Record

At the Third Step of the sequential evaluation process, the ALJ must consider whether any of the claimant's severe impairments meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appx. 1.  A person who meets or medically equals an impairment found in the listing of impairments in 20 C.F.R. 404, Subpart P, Appendix 1 is found to be disabled without further analysis.    20 C.F.R.  §§

---

[5]     By "off task" the Court assumed the ALJ meant not working.

[6]     Interestingly, Simmon's attorney never pointed out to the VE or ALJ that Simmon had never performed the job of electric assembler.

404.1520(a)(4)(iii); 416.920(a)(4)(iii).  In a disability case, the plaintiff has the burden of proving that his or her conditions meet or equal a Listing.  Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)).

Before an ALJ considers whether an impairment meets or equals a listed impairment at the third step, there must first be a medically determinable impairment garnered from medical evidence from an acceptable medical source.  See Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) ("The determination of medical equivalence is made based on medical evidence, supported by acceptable laboratory and clinical diagnostic techniques.") (citation omitted).

A Listing is met when an impairment meets all of the Listing's specified criteria. Johnson, 390 F.3d at 1070 (citing Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify."))  "[A] claimant . . . must present medical findings equal in severity to all the criteria for the one most similar listed impairment."  Sullivan, 493 U.S. at 531.  (emphasis in original). Similarly, "[t]o establish equivalency, a claimant 'must present medical findings equal in severity to all the criteria for the one most similar listed impairment.'"  Carlson v. Astrue, 604 F.3d 589, 594 (8th Cir. 2010) (quoting Sullivan, 493 U.S. at 531) (emphasis in original).

The decision as to whether impairments are covered by or medically equal to a listed impairment must be based on expert medical opinion.  See Barnett v. Barnhart, 381 F.3d 664, 670 (7th Cir. 2004) (citing 20 C.F.R. § 1526(b)) ("Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue."); Retka v. Comm'r of Soc. Sec., 70 F.3d 1272, 1272 (6th

Cir. 1995) (table opinion) ("Generally, the opinion of a medical expert is required before a determination of medical equivalence is made.") (citing 20 C.F.R. § 416.926(b)); Daniel v. Barnhart, Civ. No. 01-852 (JRT/AIB), 2002 WL 31045847, at *2 (D. Minn. Sept. 10, 2002) ("The decision as to whether impairments are medically equal to a listed impairment must be based on medical testimony.") (citing Fenn v. Shalala, 884 F.Supp. 267, 273-274 (N.D. Ill. 1995)).

"The ALJ bears a responsibility to develop the record fairly and fully, independent of the claimant's burden to press his case." Snead v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004) (citations omitted). This is because an administrative hearing is a non-adversarial proceeding; consequently, the ALJ must develop the record fully and fairly so that "'deserving claimants who apply for benefits receive justice.'" Wilcutts v. Apfel, 143 F.3d 1134, 1138 (8th Cir. 1998) (quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994). Moreover, because "[t]he ALJ possesses no interest in denying benefits and must act neutrally in developing the record," the ALJ's duty to develop the record exists even when the claimant is represented by counsel at the administrative hearing. Snead, 360 F.3d at 838.

An ALJ's duty to develop the record is not unqualified, and does not relieve the claimant from identifying the issue or issues requiring further development. Wall v. Astrue, 561 F.3d 1048, 1062-1063 (10th Cir. 2009). Further, where a claimant is represented by counsel, the ALJ "should ordinarily be entitled to rely on the claimant's counsel to structure and present claimant's case in a way that the claimant's claims are adequately explored." Duncan v. Astrue, Civ. No. 08-2144, 2009 WL 1254737, at * 5 (D. Kan. May 5, 2009) (citing Hawkins v. Chater, 113 F.3d 1162, 1168 (10th Cir. 1997)).

The ALJ has a duty to develop the record during a disability hearing consistent with the issues raised. Id. (citation omitted).

"Where the ALJ fails to fully develop the record, this court may remand for the taking of further evidence." Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002), (citing Payton v. Shalala, 25 F.3d 684, 686 (8th Cir. 1994). "[R]eversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995) (citing Onstad v. Shalala, 999 F.2d 1232, 1234 (8th Cir.1993)). An ALJ is not required to obtain additional medical evidence if the other evidence in the record provides a sufficient basis for the decision. See Warburton v. Apfel, 188 F.3d 1047, 1051 (8th Cir.1999) (citation omitted).

Simmon's argument that the ALJ should have obtained medical expert testimony regarding whether his impairments met or equaled Listing §4.04(C) (Ischemic Heart Disease) is rejected. See Yancey v. Apfel, 145 F.3d 106, 114 (2nd Cir. 1998) ("20 CFR § 404.1512 explicitly places the burden of supplying all relevant medical evidence on the claimant . . . ."). The ALJ is only required to obtain medical expert testimony when the record is inconclusive as to whether the claimant's impairments meet or are equal to a Listing, or if additional medical evidence is received that in the opinion of the ALJ may change the State Agency medical consultant's finding that the impairment do not meet a Listing or are not equivalent in severity to a Listing. See e.g., SSR 96-6P, 1996 WL 374180 at *3-4 ("[A]n administrative law judge and the Appeals Council must obtain an updated medical opinion from a medical expert in the following circumstances: When no additional medical evidence is received, but in the opinion of the administrative law judge or the Appeals Council the symptoms, signs, and laboratory findings reported in

the case record suggest that a judgment of equivalence may be reasonable; or when additional medical evidence is received that in the opinion of the administrative law judge or the Appeals Council may change the State agency medical or psychological consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing of Impairments.") (footnote omitted); see also Simon v. Astrue, Civ. No. 09-5523, 2010 WL 4269607, at *3 (E.D. Pa., Oct. 28, 2010) ("At the third step of the sequential analysis, an ALJ is only obligated to obtain ME testimony when the record is inconclusive as to whether the claimant's impairments are equal to a listing.") (citing Diehl v. Barnhart, 357 F.Supp.2d 804, 815 (E.D. Pa. 2005); S.S.R. 96–6p)).

Here, there was no reason for the ALJ to obtain additional medical evidence to address whether Simmon's impairments met or equaled Listing 4.04(C) for the simple reason that there was overwhelming evidence that Simmon did not meet the second prong of the Listing – that his heart disease resulted "in very serious limitations in the ability to independently initiate, sustain, or complete activities of daily living."  The medical evidence was uncontroverted that Simmon had ischemic heart disease and the ALJ found that was the case. (Tr. 21).  The record was also replete with evidence that Simmon was not limited in his activities of daily living.  In fact, Simmon's health care providers noted repeatedly that Simmon was doing quite well from a cardiovascular standpoint and encouraged him to engage in home exercise programs or obtain a gym membership.  (Tr. 529, 531, 532, 554, 576).  Simmon testified that he had joined a gym and was walking on a treadmill.  (Tr. 78, 79).  Simmon needed no help with self-care and was living independently, cooking and caring for himself, did his laundry, had help from his family with yard work, shopped two or three times a week, walked, drove a car,

and could handle his own finances.  (Tr. 81, 272).  Within six months of the date of the administrative hearing, Simmon had applied for work in the retail sector.  (Tr. 85).  In light of all of the evidence that Simmon's activities of daily living were not seriously limited, the ALJ was not obligated to seek out a medical opinion regarding equivalency.

In addition, the ALJ properly relied on the opinions the State Agency consulting physicians, Dr. Salmi and Dr. Larson, both of whom concluded that Simmon's conditions did not meet or equal a Listing, including Listing 4.04.  (Tr. 101-107, 124-129).  A key factor in both doctors' determinations was Simmon's ability to carry on with his activities of daily living with little or no help.  (Tr. 101, 124).  Although Simmon claims the ALJ should have obtained a medical opinion on whether he met or equaled Listing 4.04(C), it was not the ALJ's burden to go out in search of evidence that would contradict the evidence that Simmon provided regarding his ability to engage in a wide range of activities of daily living, which clearly showed that he did not meet or equal the Listing.

The medical evidence submitted after Dr. Salmi and Dr. Larson rendered their opinions did not provide any contrary evidence regarding Simmon's activities of daily living and as a result, there is no basis to remand the matter to obtain further medical expert opinions.  For example, in July, 2011, Dr. Lawler noted that Simmon was doing well from a cardiovascular point of view.  (Tr. 576).  After his arthroscopic surgery in June, 2011, Simmon was unhappy with his progress in physical therapy and sought a second opinion from Dr. Lundberg.  (Tr. 678).  Dr. Lundberg did not recommend surgery and stated "I think he needs to get much more aggressive with his therapy . . . I think it is fine for him to get back to work."  (Tr. 582).  When Simmon completed physical

therapy in February, 2012, his physical therapist noted that Simmon reported no pain in his left shoulder, no pain when completing self cares, and only occasional pain on waking up due to his sleep position. (Tr. 588).

For all of these reasons, the Court finds the record contained sufficient evidence for fair determination, George v. Astrue, 301 Fed. Appx. 581, 582–83 (8th Cir. 2008), and the ALJ properly developed the record.

### B.     The ALJ Properly Considered Dr. Mullaney's Statement

Simmon's argument that Dr. Mullaney's "RFC assessment" was entitled to controlling weight at Step Four is also rejected. For starters, Dr. Mullaney's statement in November, 2010 – that Simmon cannot "do what he used to do in terms of working as a welder and lifting due to heart disease and limitations due to pacer. I therefore recommend he consider seeking disability" – is not an RFC assessment. RFC describes the "work-related activities [that] the claimant can perform despite her limitations." Young v. Barnhart, 362 F.3d 995, 1000–01 (7th Cir. 2004) (emphasis added); SSR 96–8p ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). Further, an RFC assessment is a "function-by-function assessment." SSR 96–8p. Dr. Mullaney merely stated that Simmon could no longer work as a welder because of his pacemaker; he did not offer any opinion on the work that Simmon could do despite having a pacemaker. The ALJ agreed that Simmon could not work as a welder. (Tr. 27).

Second, even assuming that Dr. Mullaney's statement could be interpreted to suggest that he believed that Simmon was disabled within the meaning of the Social Security regulations, ALJ was not required to give Dr. Mullaney's opinion controlling weight. A treating physician's opinion is generally given "controlling weight" if it is "well-supported . . . and is not inconsistent with the other substantial evidence in [the claimant's] case record. " 20 C.F.R. § 404.1527(c)(2). "However, an ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010) (citation and internal quotation omitted). "The ALJ is not required to believe the opinion of a treating physician when, on balance, the medical evidence convinces him otherwise." Ahlstrom v. Astrue, Civ. No. 08-5768 (RHK/RLE), 2010 WL 147880, at *23 (D. Minn. Jan. 11, 2010). "[O]pinions of treating physicians, on questions reserved for the Commissioner—such as whether a claimant is disabled, or is unable to work—are not to be given any weight by the ALJ. Id. (citing 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1)).

Here, the medical evidence does not support the conclusion that Simmon cannot work at all. Simmon's pacemaker was functioning well, and his cardiologist Dr. Lawler concluded that Simmon was doing well from a cardiovascular standpoint. (Tr. 531, 576). Dr. Lawler encouraged Simmon to exercise. (Tr. 532). Simmon's episode of dizziness and high blood pressure resolved spontaneously (Tr. 746). Simmon's orthopedist Dr. Lundberg noted that by January, 2012, Simmon was doing much better with his shoulder injury. (Tr. 580). Further, on discharge from his course of physical

therapy in February, 2012, the physical therapist stated that Simmon reported no pain in his left shoulder and had no pain with self cares.  (Tr. 588).  Simmon was exercising at home and driving without impairment.  (Id.).

In sum, the ALJ committed no error with respect to Dr. Mullaney's November, 2010 statement.

### C.    The ALJ's Hypothetical to the VE

It appears that Simmon never worked as an electrical assembler.[7]  Therefore, the ALJ was mistaken when he asked the VE whether Simmon could perform this work, (Tr. 90), and erred when he concluded at Step Four that Simmon could perform past work as an electrical assembler.  (Tr. 27).  However, at Step Five, the ALJ found that "there are other jobs existing in the national economy that [Simmon] is also able to perform" and made alternate Step Five findings.  (Tr. 27-29).  The ALJ found that given a sedentary RFC with all of the restrictions the ALJ had noted, there existed jobs in the national economy Simmon could perform, such as a document preparer, cutter and a lens inserter.  (Tr. 28).  As a result, Simmon was not disabled.  (Tr. 29)

Simmon has not pointed to any limitations not accounted for in the ALJ's hypothetical to the VE.  Nor has he claimed that the ALJ erred in concluding that there were jobs in the national economy Simmon could perform at the sedentary level given the restrictions the ALJ imposed.  As a result, the ALJ's erroneous reference to Simmon's past work as an electrical assembler was harmless and not cause for remand.  See Byes v. Astrue, 687 F.3d 913, 917 (8th Cir. 2012) ("To show an error was

---

[7]    The Commissioner did not argue that Simmon actually had past relevant work as an electrical assembler.  Def. Mem., p. 7.

not harmless, [the claimant] must provide some indication that the ALJ would have decided differently if the error had not occurred") (citations omitted).

Further, Simmon's argument that the ALJ should have included in his hypothetical questions to the VE "specific limitations consistent with the residual functional capacity opinion of Dr. Mullaney," (Pl. Mem., p. 18), finds no support in the record. For the reasons previously stated, Dr. Mullaney's statement was not an RFC assessment, and there were no limitations that Dr. Mullaney noted that the ALJ did not consider. Dr. Mullaney merely stated that Simmon could no longer work as a welder and had (undefined) lifting restrictions. The ALJ addressed both of those issues. (Tr. 22, 27).

IX. **CONCLUSION**

It was Simmon's burden to prove that he met or medically equaled a listed impairment. Simmon provided no evidence that he met or equaled Listing § 4.04(C), and the evidence was unequivocal that he did <u>not</u> meet the Listing because there he had no "very serious limitations" in his activities of daily living. Additionally, there was substantial evidence in the record to support the ALJ's determination that Simmon was not disabled and the ALJ committed no error in developing the record. Lastly, the error the ALJ committed in referring to Simmon's past employment as an electrical assembler was harmless and did not affect the outcome.

**X.     RECOMMENDATION**

For the reasons set forth above, **IT IS RECOMMENDED THAT**:

1.      Plaintiff's Motion for Summary Judgment [Docket No. 13] be **DENIED**; and

2.      Defendant's Motion for Summary Judgment [Docket No. 15] be **GRANTED**.

Dated: December 2, 2014

*Janie S. Mayeron*
JANIE S. MAYERON
United State Magistrate Judge


**<u>NOTICE</u>**

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **December 16, 2014**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within fourteen days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.